# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 6512 | **DATE** | 7/13/2001 |
| **CASE TITLE** | Massimo Fabri vs. Lesley Pritikin-Fabri | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. For the foregoing reasons, Petitioner Massimo Fabri's motion for a warrant in lieu of a writ of *habeas corpus* (Doc. 2-1), and his motion for return of child under the Hague Convention (Doc. 31-1) are granted. Respondent's motion to strike certification (Doc. 11-1), motion to dismiss (Doc. 12-1), motion for a directed verdict (Doc. 27-1), motion to declare the Hague Convention unconstitutional (Doc. 30-1) and motion to strike (Doc. 36-1) are denied. The court hereby orders that Arianna Michelle Fabri be returned to Italy on or before July 31, 2001, with Respondent Lesley Pritikin-Fabri, should she wish to accompany Arianna. Should Respondent prove unwilling to accompany her daughter to Italy, Arianna shall be returned there with Petitioner.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | 2 | | **Document Number** |
|---|---|---|---|---|---|---|
| | No notices required. | | | number of notices | | |
| ✓ | Notices mailed by judge's staff. | | | JUL 1 6 2001 | | 41 |
| | Notified counsel by telephone. | | | date docketed | | |
| | Docketing to mail notices. | | | docketing deputy in. | | |
| ✓ | Mail AO 450 form. | | | 7/13/2001 | | |
| | Copy to judge/magistrate judge. | | | date mailed notice | | |
| ETV | courtroom deputy's initials | | FILED FOR DOCKETING 01 JUL 13 PM 6:39 | ETV | | |
| | | | Date/time received in central Clerk's Office | mailing deputy initials | | |

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

IN RE THE APPLICATION OF )
MASSIMO FABRI, )
                       )
         Petitioner, )
                       )
        v. )      No. 00 C 6512
                       )
LESLEY PRITIKIN-FABRI, )      Judge Rebecca R. Pallmeyer
                       )
        Respondent. )

DOCKETED
JUL 16 2001

## MEMORANDUM OPINION AND ORDER

Massimo Fabri, a citizen and resident of Italy, asks this court to order his estranged wife, Lesley Pritikin-Fabri, to return their daughter Arianna to Italy, where the child has lived since her birth on November 26, 1991. Petitioner invokes the 1980 Hague Convention on the Civil Aspects of International Child Abduction, 19 I.L.M. 1501, 51 Fed. Reg. 10498 (the "Convention") and the International Child Abduction Remedies Act, 42 U.S.C. § 1160 *et seq.* ("ICARA" or the "Act"). Both the United States and Italy are parties to the Convention. The court has jurisdiction pursuant to 42 U.S.C. § 11603, and the case is properly brought here because Arianna is now located in Chicago. 42 U.S.C. § 11603(b).

## BACKGROUND

Petitioner and his wife were married in Chicago on March 21, 1989. For some time before their marriage, and continuously since then, Massimo and Lesley have lived in Rome, Italy. Arianna Michelle Fabri was born in Italy in 1991 and has lived there all her life. In April 2000, Massimo and Lesley separated and Massimo moved

41

into a separate apartment, but Arianna saw him regularly. Until this past academic year, Arianna attended elementary school in Rome. She played on a youth soccer team and was registered for a soccer program to begin on September 27. When Lesley and Arianna did not appear for soccer practice that afternoon, as expected, Massimo Fabri went to the home where Lesley and Arianna lived and discovered they had left Italy suddenly to attend to Leslie's father, who was recuperating from heart surgery in Chicago. Massimo Fabri attempted to reach his wife in Chicago for several hours, but did not speak to her until September 28, 2000. On that day, Lesley called her husband to tell him where they were. She did not give him an expected date for their return, and an argument ensued. Four days later, on October 2, 2000, Lesley Pritikin-Fabri obtained an Order of Protection from a Cook County judge. On October 6, she filed a *praecipe*, a pleading which initiates a divorce proceeding in Illinois practice.

Massimo was served with the Illinois *praecipe* and Order of Protection. He promptly filed this petition under the Hague Convention.

## THE HAGUE CONVENTION

The Hague Convention, to which both Italy and the United States are signatories, was established to protect children from the harm resulting from "wrongful removal or retention" and to establish procedures for returning children to their home country. Hague Convention, preamble. Article I sets forth these purposes as: "(a) to secure the prompt return of children wrongfully removed to or retained in any Contracting State; and (b) to ensure that rights of custody . . . under the law of one Contracting State are effectively respected in the other Contracting States." *Id.* Art. 1.

The Convention defines removal or retention of a child as "wrongful" if it is in breach of custody rights under the law of the child's habitual residence (in this case, Italy), and those custody rights were actually exercised at the time of the child's removal. *Id.* Art. 3.

Claiming his daughter had been wrongfully removed to the United States, Petitioner Massimo Fabri applied to the Central Authority of his country, as directed by the Convention, and ultimately filed this action in federal court. *See id.* Arts. 8, 11, 29; *see also* 42 U.S.C. §§ 11601 *et seq.* (legislation implementing the Hague Convention). This court has authority to determine the merits of the abduction claim, but has no authority to make determinations concerning any underlying custody dispute. *Blondin v. Dubois*, 189 F.3d 240, 245 (2d Cir. 1999) (citing *Friedrich v. Friedrich*, 983 F.2d 1396, 1400 (6th Cir. 1993) ("*Friedrich I*")); Hague Convention, Art. 19. Petitioner has the burden of proving that his wife wrongfully removed or retained their child, 42 U.S.C. § 11603(3)(1)(A), and if he meets that burden, the child "must be returned unless the defendant can establish one of four defenses," described below. *Friedrich v. Friedrich*, 78 F.3d 1060, 1067 (6th Cir. 1996) ("*Friedrich II*").

In order to determine whether Arianna was wrongfully removed, this court considers four questions: (1) When did the removal or retention at issue take place? (2) Prior to the removal, where was Arianna "habitually present"? (3) Did the removal or retention breach Massimo Fabri's custody rights under the law of Arianna's habitual residence? and (4) Was Massimo exercising those rights at the time of the removal or

retention? *See, e.g., Diorinou v. Mezitis,* 237 F.3d 133, 141 (2d Cir. 2001); *Mozes v. Mozes,* 239 F.3d 1067, 1070 (9th Cir. 2001). As the implementing legislation explains, if Massimo Fabri prevails on these issues and demonstrates that his daughter was wrongfully removed or retained, she must be "promptly returned unless one of the [four] narrow exceptions set forth in the Convention applies." 42 U.S.C. § 11601(a)(4).

Four exceptions to the reach of the Convention are set forth in Articles 12, 13, and 20. The responding parent bears the burden of proving that one of these exceptions applies. For two of the exceptions, the burden is one of "clear and convincing evidence." Specifically, the responding parent may avoid an order returning the child if she can demonstrate by clear and convincing evidence (1) that "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation," Art. 13(b), or (2) that returning the child would be inconsistent with "fundamental principles . . . relating to the protection of human rights and fundamental freedoms." Art. 20. *See Blondin,* 189 F.3d at 245, citing 42 U.S.C. § 11603(e)(2)(A). The other two exceptions are subject to proof by a preponderance of the evidence. These include a showing (3) that judicial proceedings were not commenced within one year of the child's abduction, and she is now well-settled in her new home, Art. 12, or (4) that the petitioning parent was not actually exercising custody rights at the time of the child's removal. Art. 13(a). *Blondin,* 189 F.3d at 245, citing 42 U.S.C. § 11603(e)(2)(B).

As the implementing legislation makes clear, these four exceptions are intended to be narrow. 42 U.S.C. § 11601(a)(4). This court has no authority to make a

determination regarding who is the better parent; that determination is to be made by the court having jurisdiction over the custody issue. *Blondin*, 189 F.3d at 246 (citing *Friedrich I*, 983 F.2d at 1400); *Nunez-Escudero v. Tice-Menley*, 58 F.3d 374, 377 (8th Cir. 1995) ("who is the better parent in the long run" not relevant to the Convention exception for physical or psychological harm). A broad interpretation of the four exceptions "would frustrate a paramount purpose of that international agreement—namely, to 'preserve the status quo and to deter parents from crossing international boundaries in search of a more sympathetic court.' " *Blondin*, 189 F.3d at 246 (quoting *Friedrich I*, 983 F.2d at 1400) (other citations omitted).

Before addressing each party's burden of proof, the court reviews the evidentiary record in detail.

## FACTS

### Lesley Pritikin-Fabri's Testimony

Lesley Pritikin-Fabri testified that she has lived in Italy for 11 years following her marriage to Massimo. The couple's daughter Arianna was born there and has attended school and summer camp in Italy, and plays in a youth soccer league. (Transcript of Evidentiary Hearings (hereinafter "T."), at 61-62.) Both Lesley and Arianna are United States citizens whose passports were issued at the U.S. Embassy in Rome. (T. 291.)

Lesley and Arianna spent the month of August 2000 in Chicago, where Lesley's father, mother, twin sister Lauren Pritikin, and another sister all live. (T. 67.) Lesley's sisters both work full time, and one of them is married to a "successful doctor."

(T. 82, 84.) Just weeks after their return on September 4, Lauren Pritikin called Lesley late at night, told her their father was very ill, and urged her to return immediately to Chicago. (T. 72, 74.) Lesley testified that she attempted to contact her husband on his cellular telephone (the only contact she had for him), but did not get an answer. (T. 74.) Early on September 27, Lesley and Arianna flew from Rome to Chicago (T. 75), leaving the bulk of their possessions, including Lesley's jewelry in Italy. (T. 183, 249, 258.) Before leaving, Lesley had pinned to the front entry a handwritten note which reads in full as follows:

27-09-00

MASS,

I HAD TO LEAVE FOR CHICAGO. MY DAD IS VERY SICK. IT'S AN EMERGENCY. YOU CAN CALL AND LEAVE A MESSAGE AT MY MOM'S HOUSE. I'LL CALL YOU WHEN THINGS ARE CLEAR.

Lesley

By the time Lesley and Arianna had arrived in Chicago, Massimo had left messages for her with her mother and her sister. (T. 75.) He finally reached Lesley on September 28. Lesley explained in this call that she had tried to reach him but "I had no time," told him that her decision was of an "emergency nature," and that the return to Chicago was "absolutely temporary, but I couldn't give him a precise date, that I would be in contact with him daily." (T. 75-76.) Massimo became angry, told Lesley that "he is going to take Arianna back," and threatened to "make [Lesley] pay" for her actions. (T. 76.) Massimo demanded to know when Lesley would return to Italy with Arianna, but Lesley would not set a date for their return. (T. 77.) She testified that

it remains her intention to return (T. 77) but has "no idea" when that will happen. (T. 86.)

Lesley testified that her father had been hospitalized from July 10 until September 25, that he had undergone bypass surgery years before, and that "he also is homeless . . . and without work." (T. 77, 78.) She believed her father was near death in July and had discussed this matter with Massimo. (T. 79-80.) Since coming to Chicago, Lesley has taken responsibility for her father's care. (T. 82.)

Massimo made several angry telephone calls to Lesley. "Totally surprised" by his "violent reaction," (T. 88), she sought an Order of Protection in Circuit Court on October 2, 2000. (T. 85.) On October 6, she filed a *praecipe*, a preliminary step toward divorce proceedings. (T. 85.) She testified that prior to his angry telephone calls, she "had never thought of divorce," and had "never sought separation in any manner," despite the fact that when Massimo left her in April, he had acknowledged seeing another woman. (T. 88, 89.)

Lesley testified that in March 2000, Massimo told her that he "was tired of family obligations," and that "it didn't look" as though he would come back. (T. 246.) Massimo moved out of the family home in April 2000, and Lesley has had principal responsibility for dressing her daughter, taking her to school, buying and preparing food, and arranging for after-school care. (T. 247.) She testified that Massimo has given her no money for Arianna's support. (T. 248.) She testified, further, that he had never earned any income during the 11 years of their marriage (T. 261), but acknowledged that he has been employed by a medical society since June 1999. (T.

- 7 -

262.)   Massimo has sold the family home (in which Lesley and Arianna still live) to a friend of his.  According to Lesley, the new owner has told her that nobody is paying rent and that " 'I could throw you out if I want, but I have no interest in moving in right now.' " (T. 248.)

Lesley disputes the frequency with which Massimo saw their daughter, but she acknowledged that Massimo took Arianna on a four-day trip to Sardinia in September 2000 and that he may also have taken her with him to his family home in the country in June of that year.  (T. 63, 65.)  She also testified that Massimo attended Arianna's soccer practices "occasionally" (T. 65, 259), and that "occasionally on Wednesdays" when Lesley was attempting to work, Arianna would spend the night with Massimo. (T. 260.)  She acknowledged, further, that Massimo "was extremely active in raising . . . Arianna," that "he is a good father," and that he has a "strong relationship" with his daughter.  (T. 66.)

**Massimo Fabri's Testimony**

Petitioner Massimo Fabri came to the United States at the inception of this petition and proceedings, traveling first to Atlanta in the company of a female friend with whom he shared a room in order to reduce his expenses.  (T. 374-76, 387.)  He remained in this country from October 20 through October 31 (T. 356), but gave testimony in this case by telephone after his return to Italy.  Through an interpreter, Massimo provided a detailed account of his ongoing contacts with his child.  Massimo testified that after he and Lesley were separated, he continued to see Arianna regularly, picking her up after soccer practice on Mondays and Wednesdays and from

her sitter's home on Fridays. (T. 318, 320.) The schedule remained the same after Arianna finished school in June and began attending summer camp from 8:30 a.m. until 5:00 p.m. (T. 321.) He testified, further, that Arianna spent the night in his home every Wednesday and sometimes on weekend nights. (T. 318.) She spent the night at his home on one occasion in May when Lesley celebrated her birthday by having dinner with a friend. (T. 319.) Mr. Fabri testified that he himself paid for summer camp. (T. 322.) In June, he took Arianna on a five-day trip to his parents' country home. (T. 322.) He took her to the dentist on July 21. (T. 322-23.) On one Saturday in July, he went with her to the sea for a visit with aunts and uncles. (T. 323.) During his wife's and daughter's August 2000 visit to Lesley's family in Chicago, Mr. Fabri testified, he spoke to his wife and daughter on the phone at least every other day. (T. 324.)

Massimo had driven Lesley and Arianna to the airport on August 4 for their annual month-long visit with Lesley's family in Chicago, and picked them up on September 4. (T. 323-25.) In a conversation soon after her return, Massimo reported, Lesley proposed "that she would find a job in America," taking Arianna with her. (T. 325.) Massimo responded by saying that he wanted to see his daughter grow up, not to see her just one month each year, and that he would work with Lesley "to find a reasonable solution here in Italy." (T. 326.) Massimo recalled that the conversation ended "with a big hug and a promise to find this kind of solution." (T. 326.)

During the month of September, Massimo continued to have regular contact with his daughter. From September 7 until September 10 or 11, Arianna accompanied

him on vacation in Sardinia. (T. 325, 328.) Following their return, Massimo took Arianna to school on September 12, the first day of school, and, at Arianna's request, explained to the teacher that an out-of-town trip had prevented her from doing homework that she was expected to complete over the summer vacation. (T. 328-29.) Massimo testified that he was angry that Lesley hadn't worked with Arianna to get the work done. (T. 329.) Massimo next saw Arianna when she spent the night at his home on Wednesday, September 13, and he saw her again the next Friday evening, when she joined him for dinner with his parents and again spent the night at his home. (T. 329.) The next evening, Saturday, September 16, Massimo joined his wife and daughter and a visitor, Chris Benoodt, in a Rome restaurant for dinner. (T. 330.) He saw Arianna again on September 18, when he met her with her mother and Ms. Benoodt at the Spanish Steps. (T. 331.)

Massimo Fabri recalled that prior to joining Lesley and Chris Benoodt, he had gone with Arianna to register her for soccer school, at Arianna's request making particular efforts to ensure that Arianna would be placed with the same coach she had had the year before. (T. 331-32.) Mr. Fabri noted proudly that "she is the only girl in a soccer school that's frequented by boys, and she is one of the best." (T. 332.) From September 20 to 24, while Mr. Fabri was at a conference in Sicily relating to his job, he spoke to Arianna every day. (T. 332.) On September 25, he again met Arianna, Lesley, and Chris Benoodt late in the afternoon. (T. 333.) When Arianna didn't show up for soccer practice on September 27, as he expected, Mr. Fabri went to the family home and learned that his wife and daughter had left Rome for Chicago that morning.

(T. 334.) Because Lesley had changed the locks in April, Mr. Fabri engaged a locksmith and entered the apartment. (T. 382.)

Massimo testified that he was unable to reach Lesley, as her answering service was not working, but that his own phone was functioning. (T. 334.) He acknowledged that he was at work until late in the evening on September 26. (T. 339.) After learning of Lesley's and Arianna's departure on September 27, he called his wife's mother's home and her sister's home and the sister's cell phone number and left messages. (T. 344.) He recalled that Lesley called him back at 8:30 the next morning and after that call "there were many others." (T. 345.) After three phone calls, Mr. Fabri testified, he was finally permitted to speak with Arianna, and he has kept notes showing that he spoke to her on September 30, October 1, October 3, October 4, and October 9. (T. 345, 372.)

On October 9, Mr. Fabri received a copy of the Order of Protection entered by the Circuit Court of Cook County, an order that he understood prohibited him from speaking either with Lesley or Arianna. (T. 345, 372-73.) Lesley testified that when Massimo came to Chicago in connection with this Hague Convention proceeding, he did not call her, and saw Arianna only for one two-hour visit. (T. 253.) Massimo confirmed that he had been able to see his daughter for only two hours on October 25, pursuant to court order. (T. 346.) After returning to Italy, Mr. Fabri sent his daughter a birthday card a few days before her birthday on November 26. (T. 359.) At the time of his testimony on December 7, 2000, counsel had reached an agreement under which

Mr. Fabri was able to speak to his daughter nearly every day. He had spoken to her most recently the previous morning. (T. 386.)

Massimo testified that during July 2000, he "spent a lot of time" with Lesley, discussing the possibility that she might need to make an immediate trip to America due to her father's illness. (T. 340.) Because he is friendly with a travel agent, Massimo was able to maintain a reservation for her from day to day and otherwise to provide "moral and practical support." (T. 340.) He spoke to her at least once or twice while she was at work early in September. (T. 341.)

Since June 1999, Massimo has been employed as Administrative Secretary for the Federation of Family Doctors in Italy. (T. 340.) He also maintains a partnership in a chicken farm, but has not yet drawn any income from that business. (T. 369-70.) Mr. Fabri acknowledged that he had sold the family's apartment in November 1996 and gave the purchase price to his father, who had advanced the purchase money to him. (T. 374-75, 386.) He testified, however, that he continues to pay rent for that apartment, one million lira per month (approximately $6000 annually). (T. 341-42.) When he moved out in April 2000, Mr. Fabri moved into an apartment that belongs to his family. (T. 342.) He paid April rent on the family apartment, and a condominium fee. (T. 342.) He paid for soccer school and summer camp, and paid the sitter through the month of June. (T. 343.) Later, when Mr. Fabri discovered unpaid utility bills in September, he paid those bills as well. (T. 343.) He has not sent his wife any money since her departure in September (T. 369), but has continued paying rent, phone bills, and electricity bills. (T. 387.)

**Evidence from Family Friends**

Lynn Brown, a family friend, testified that Massimo had spoken to her in a lengthy telephone call within the last year concerning the possibility that Lesley and Arianna might come to the United States. (T. 104.) According to Ms. Brown, Massimo told her in that conversation that the possibility that Lesley might move with Arianna to Chicago "wasn't what he hoped would happen, but he realized that it could be inevitable and he wouldn't be opposed to it." (T. 105.) She testified, further, that Massimo's reputation is that he is not "particularly truthful." (T. 107.) Ms. Brown spoke to Lesley about Lesley's father's illness and told Lesley that "the right thing . . . was to be near her family when they needed her." (T. 109.) Mr. Fabri denied having told Lynn Brown that he believed Arianna's move to the United States was "inevitable," and denied having told his wife he was "tired of being tied to the family," though he admitted having "problems with the marriage." (T. 344.)

Diana Harris, who also has known Lesley and Massimo for years, testified that she believes Massimo is "not a truthful person." (T. 128.) She noted that Lesley has a "wonderful, wonderful relationship" with Arianna, for whom she "has been the bread winner," and has been "the one that takes her to the doctor all the time, makes the appointments, plans the birthday parties, has her see the grandparents, everything." (T. 129-130.)

Chris Benoodt visited Lesley in September 2000, staying initially in a hotel in Rome and later at Lesley's home. (T. 166.) Ms. Benoodt recalls that Massimo joined Ms. Benoodt, Lesley, and Arianna for dinner on only one occasion while she was

staying in the hotel. (T. 180.) According to Ms. Benoodt, Lesley was caring for Arianna by "providing the meals and clothing," "taking her to school," and "mak[ing] arrangements for baby-sitters or pick up from school . . ." (T. 167.) She acknowledged, however, that Massimo loves Arianna and that Arianna loves him. (T. 180.)

During the course of Ms. Benoodt's visit, Lesley received a series of phone calls that left her "deeply concerned." (T. 169.) On the morning of September 27, Lesley was very upset and "panicked," concerned that her father was suicidal. (T. 171.) Lesley abandoned her plan to accompany Ms. Benoodt for sightseeing that evening, and Ms. Benoodt helped Lesley pack a bag for travel to Chicago. (T. 172, 173.) Ms. Benoodt observed that Lesley made several unsuccessful attempts to contact Massimo before leaving him a note on the door of her home. (T. 180-81, T. 174.) Ms. Benoodt believes Massimo "has not completely been truthful about some things in his relationship and in business as I know it." (T. 177.)

Martine Boudonis is the wife of Massimo's business partner. (T. 188-89.) She believes he is a "good person," but that he does not always tell the truth. (T. 200.) She observed that Massimo's father was very critical of Lesley. (T. 202.) In the last year, Lesley has frequently borrowed money from Ms. Boudonis. (T. 206.) Ms. Boudonis characterized Massimo as "a good father," and testified that Arianna loves her father. (T. 209.)

Massimo Fabri offered several sworn declarations from other witnesses which, not surprisingly, confirm his commitment to Arianna. Paolo Remondino, who has lived with Massimo's sister for many years, characterized Massimo as "extremely honest,

upstanding and reliable from all standpoints." Mr. Remondino believes Mr. Fabri is an "exemplary father" who is "greatly attached" to his daughter. (Petitioner's Ex. 10A.) Massimo Loquenzi, who was Mr. Fabri's "working partner" from 1992 through 1997, said he is "in a position to vouch for [Massimo Fabri]'s honesty, integrity and dedication to the work," and for Mr. Fabri's "total dedication . . . to family life," particularly to his daughter. (Petitioner's Ex. 11A.) Arianna's schoolteachers, Ragusa Grazia and Rossi Ferrari Ezio, both reported that Mr. Fabri "has always surrounded his daughter . . . with patience and great affection," and that "he has always participated in school meetings, constantly requesting information on the academic progress of his daughter." (Petitioner's Ex.s 12A, 13A.) DiStella Rosalina recalled seeing Mr. Fabri at sports events and competitions with Arianna. (Petitioner's Ex. 15A.) Dr. Pier Luigi Bartoletti, Secretary of the Italian Federation of Family Doctors (Massimo Fabri's employer), called Petitioner "an honest person, totally dedicated to his work, which he has always performed with extreme attention and punctuality." (Petitioner's Ex. 14A.)

### Lauren Pritikin's Testimony; Lesley's Father's Condition

Lauren Pritikin, Lesley's twin sister, testified that she contacted Lesley on September 26 because their father was "in such a horrible mental state" that she feared he would harm himself. (T. 216.) The father was still hospitalized at that time. (T. 226.) Lauren told Lesley that her father had threatened "to pull out any tubes" and to stop eating. (T. 216-17.) Lauren told her sister that her father urgently needed her.

(T. 217.) She said, "Just leave and come to me. Your loyalty is to your family, your loyalty is to me and your loyalty is to daddy." (T. 218.)

Lauren recalled that in a conversation with Massimo early in 2000, Massimo had suggested that Lauren "check into some schools" for Arianna "because he had thought that it was a good idea for my sister and my niece to come here to Chicago without him." (T. 219.) Lauren testified that Massimo was concerned about his family's limited finances and believed that Lesley "could find better possibilities here." (T. 221.) During the summer of 2000, Lauren had difficulty reaching Massimo on his cell phone; she testified that he was "extremely inaccessible." (T. 221.) Arianna has, however, been in touch with her father since coming to Chicago. (T. 222.) When Massimo spoke to Lauren on September 27, she invited him to come and stay at her own home. (T. 223.)

During her stay in Chicago, Arianna has been staying at Lauren Pritikin's home, but Lesley most frequently has been staying with their father. (T. 224.) Since his discharge from a two-week stay in a rehabilitation facility following his hospitalization, the father has been in a temporary residence two blocks away from Lauren's home. (T. 226, 274.) Lauren, employed full time, believes that Lesley "was in a better position to be able to spend all day long with my father if need be." (T. 227.) Another sister, Karen Pritikin, who also lives in Chicago is, according to Lauren, "unwilling and unable to take care of my father." (T. 228.) The father's own wife of fifteen years, who now lives in an apartment in Greece, is aware of his circumstances but is unwilling to return and care for him. (T. 228, 275.) The father is no longer

hospitalized (T. 229), does not use intravenous devices or oxygen, and can walk, albeit with difficulty. (T. 230.) He remains depressed. (T. 234-35.) Lesley is providing daily care for him (T. 235), purchasing groceries, wrapping his legs, and caring for his personal hygiene. (T. 252.) Lesley believes, however, that if the family could find a place for him to live permanently, he would be capable of living on his own. (T. 276.)

## DISCUSSION

### A.  Petitioner's Case

In order to establish his right to seek Arianna's return pursuant to the Hague Convention, Petitioner Massimo Fabri must demonstrate that Arianna was wrongfully removed or retained in the United States. To do so, Mr. Fabri must establish by a preponderance of the evidence that Arianna was "habitually present" in Italy prior to her removal in September, that her removal or retention in the United States violates Mr. Fabri's custody rights under the laws of Italy, and that he was actually exercising those rights at the time of her removal or retention.[1] The court finds he has met this burden.

### 1.  Habitual Presence

Respondent Lesley Pritikin-Fabri has not challenged Petitioner's claim that Italy is the place of Arianna's "habitual presence," and the court readily concludes the

---

[1]    That Petitioner was not exercising his custody rights is also, as discussed earlier, viewed as one of the four narrow exceptions to enforcement of the Hague Convention. Although such a construction would place the burden of proof on Respondent, the court will address this issue as part of Petitioner's own case in chief.

record supports that claim. Arianna was born in Italy and has lived there all her life. She has attended school and summer camp there and is a prize-winning soccer player in an Italian youth league. Arianna's annual month-long visits with her mother's family do not alter that conclusion.

## 2.    Custody Rights under Italian Law

Under Article 14 of the Hague Convention, this court may take judicial notice of the law of the habitual residence in order to determine whether the removal breached Mr. Fabri's custody rights.[2] *See Mozes*, 239 F.3d at 1084. Under the Convention, a parent's "rights of custody" include "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Art. 5(a). Rights of custody may arise "by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State." Art. 3. It is undisputed that at the time Arianna left Italy, there were no court orders or agreements between the parties with respect to her custody; thus, Italian law determines Mr. Fabri's rights of custody.

Under Italian law, "[a] child is subject to the authority of its parents until majority . . . or emancipation. The authority is exercised by both parents by mutual

---

[2]    Specifically, Article 14 provides:
In ascertaining whether there has been a wrongful removal or retention within the meaning of Article 3, the judicial or administrative authorities of the requested State may take notice directly of the law of, and of judicial or administrative decisions, formally recognized or not in the State of the habitual residence of the child, without recourse to the specific procedures for the proof of that law or for the recognition of foreign decisions which would otherwise be applicable.

agreement." Title IV, Italian Civil Code of Law, Art. 316 (Petitioner's Ex. 7A.)  It further states that "[t]hrough marriage the husband and wife acquire the same rights and undertake the same duties." *Id.* Art. 143.  The Code directs husband and wife to "agree between themselves the direction of their family life and . . . establish the family's residency according to the needs of both, and according to the major needs of the family itself." *Id.* Art. 144. Importantly, the "parents' common authority does not cease when, following legal separation . . . the children are entrusted to one of them." *Id.* Art. 317.  In the absence of any court order to the contrary, this language establishes that Mr. Fabri, as Arianna's father, has custody rights.  He contends here that Lesley Pritikin-Fabri breached those rights when she took Arianna with her to Chicago.

### 3.     Petitioner's Exercise of Custody Rights

Petitioner is entitled to relief under the Hague Convention only if he was actually exercising his custody rights at the time of Arianna's removal. Ms. Pritikin-Fabri and witnesses called by her testified that it was she who took primary care of Arianna and that Massimo's contacts with his daughter were sporadic and limited. Having heard all the testimony, the court believes Massimo has met his burden in this regard.  Despite the limitations of his own testimony (offered via long distance telephone connection, through an interpreter), it established, to this court's satisfaction, that Mr. Fabri has in fact made consistent and committed efforts to maintain his parental role in Arianna's life.  She slept at his home regularly.  He registered her for soccer, picked her up from practice, and watched her play.  His pride

in her soccer skills was evident in his tone and words. Mr. Fabri took his daughter with him for a family visit in June and a vacation to Sardinia in September. He met Arianna and his wife for dinner on occasion. Lesley Pritikin-Fabri contends he offered no financial assistance, but she did not rebut her husband's testimony that he took Arianna to the dentist, telephoned her regularly while she was in Chicago for the month of August, and met with Arianna's teacher concerning her homework on the first day of school.

Case law establishes that a parent exercises custody whenever such "a parent with de jure custody rights keeps, or seeks to keep, any sort of regular contact with his or her child." *Friedrich II*, 78 F.3d at 1064. *See, e.g., Armiliato v. Zaric-Armiliato*, No. 01 CIV. 0136, 2001 WL 472767. *9 (S.D.N.Y. May 03, 2001) (husband who assisted in determining where daughter attended school, cared for her medical needs, took her on vacation, and cared for her at his parents' home was exercising custody rights); *Whallon v. Lynn*, 230 F.3d 450, 453, 459 (1st Cir. 2000) (rights of custody exercised where respondent spent two weekends a month with child, lived near her, provided some financial support, drove her to school, bought her clothes, took her to the doctor, helped her with homework); *Norden-Powers v. Beveridge*, 125 F. Supp. 2d 634, 640 (E.D.N.Y. 2000) (rights of custody exercised where parties participated in decision making regarding education and social welfare of children, looked after their medical needs and participated in their personal care); *cf. Croll v. Croll*, 229 F.3d 133, 138-39 (2d Cir. 2000) ("custody of a child entails the primary duty and ability to choose and give sustenance, shelter, clothing, moral and spiritual guidance, medical attention,

education, etc.") Every witness asked, including Lesley herself, testified that Massimo is a loving and devoted father. The court finds he was exercising his rights of custody as of the time Lesley took Arianna to Chicago.

### 4.     Respondent's Retention as "Wrongful"

At the hearing and during arguments on this matter, the court struggled with the question of whether Lesley's removal of Arianna can fairly be characterized as "wrongful." Although Petitioner's counsel expressed distrust and suspicion concerning Ms. Pritikin-Fabri's motives from the beginning, the court did not share that skepticism. Ms. Pritikin-Fabri was presented with a very difficult choice on September 26: Her twin sister called in anguish and begged Lesley to return to the United States right away, as their father was despondent and suicidal. Whether right or wrong, Lauren and Lesley's own friends, perhaps reacting to Massimo's estrangement from Lesley, urged that she owed her loyalty to her father and family in Chicago. According to both Lesley and Chris Benoodt, Lesley attempted without success to contact Massimo. She made no secret of her whereabouts; to the contrary, she posted a large note for Massimo, telling him where she was going and where he might reach her. She told Massimo on the telephone, and testified in this court, that she fully intended to return to Italy. Indeed, at the time of her rushed departure, she needed a friend's assistance to pack a bag and left the bulk of her belongings in her home in Italy. This is not, in the court's view, conduct consistent with what we traditionally understand as "kidnapping."

As Petitioner argues, however, the case law demonstrates that the departing parent's motive is not an issue the court need consider for purposes of this Hague Convention petition. Many cases begin with a parent's taking the child away from home for a vacation or visit with the consent of the other parent, but nevertheless result in a Hague Convention order compelling the child's return. *See, e.g., Ciogola v. Fiocca*, 86 Ohio Misc. 2d 24, 29, 684 N.E. 2d 763, 766 (1997) (child ordered returned to Italy after mother took children to Ohio with father's consent for her brother's wedding); *Renovales v. Roosa*, No. FA 91 0392232 S, 1991 WL 204483 (Conn. Super. 1991) (child ordered returned to Spain after mother took child to her parents' home in Connecticut); *Wanninger v. Wanninger*, 850 F. Supp. 78, 81 (D. Mass. 1994) (children ordered returned to Germany after mother took them to Massachusetts to visit her parents, and father came to Massachusetts for unsuccessful efforts to reconcile). The fact that Massimo knew where Lesley and their daughter had gone and could contact them by phone does not render their departure consensual. *See Tabacchi v. Harrison*, No. 99 C 4130, 2000 WL 190576, *4 (N.D. Ill. 2000) (Gottschall, J.) (child ordered returned to Italy after mother sent father a note from the airport concerning their departure and father contacted them by telephone at her brother's home in Chicago).

In any event, this court need not condemn Lesley's decision to leave Italy without notice in order to conclude that Massimo is entitled to relief under the Hague Convention. That Convention proscribes not only wrongful removal but also wrongful retention of a child. Ample evidence supports the conclusion that Lesley's continued retention of Arianna must be characterized as wrongful. At the time of her departure,

- 22 -

and at the time this petition was filed, Lesley characterized her stay in Chicago as "absolutely temporary." As days have stretched into weeks, and weeks into months, any suggestion that Lesley's and Arianna's stay here is "temporary" becomes simply incredible.

Lesley has never set a date for Arianna's return to Italy, despite repeated suggestions and inquiries from the court. Lesley's intimation that her father's ill health is the reason she and Arianna must remain here does not stand up to scrutiny. The father underwent surgery in July; indeed, it is undisputed that Lesley and Massimo were in close contact during July and that Massimo had reservations ready for her sudden departure in the event of her father's death at that time. At the time Lesley rushed to his side, her father was well enough to be released from the hospital into rehabilitation and then to a home setting. Lesley is needed in Chicago, so far as the court can ascertain, not because her father is on his deathbed but because other family members are simply unwilling or unavailable to provide him with the nursing care he needs. Lesley's generosity to her father and family may be admirable, but her desire to serve them in this way cannot overcome Massimo's parental rights. Had she genuinely intended to return to Italy as she professes, the court can only conclude she and other family members would have made arrangements for her father's care that would not remove Arianna from her home environment indefinitely.

Most significant, in this court's view, was the evidence that while in Chicago, Lesley is not even residing in the same home with her daughter. Thus, to assist her own father and to spare her adult sisters inconvenience and hardship, Lesley has taken

her small daughter away from her home and assigned her to live with other relatives. As Lesley knows, Massimo is capable and willing to have Arianna in his home. Lesley has put her relationship with her own father above Arianna's relationship with hers.

## B. Respondent's Defenses

As noted, a petitioner who makes a showing adequate under the Hague Convention is entitled to relief unless the respondent proves one of four narrow exceptions. For two of those exceptions, the burden of proof is only one of a preponderance of the evidence, but neither of these exceptions requires further discussion here. There is no dispute that Massimo Fabri filed his Hague Convention petition within a year of Arianna's departure; indeed, he filed it within days. Although Lesley does dispute Massimo's claim that he was exercising his custody rights at the time of her departure, the court has considered that issue as part of Mr. Fabri's own burden of proof, and concluded that he was indeed exercising such rights within the meaning of the Convention and implementing legislation.

The two remaining exceptions require proof by clear and convincing evidence. Thus, Lesley may avoid an order granting Massimo's Hague Convention petition only if she can demonstrate by this level of proof a "grave risk" of physical or psychological harm resulting from Arianna's return to Italy, or that such an order would be inconsistent with fundamental principles of human rights and freedom. Neither of those exceptions is established in this record.

Lesley Pritikin-Fabri has argued that granting this petition would be inconsistent with fundamental principles of human rights and, in fact, has asked for

a declaration that the Hague Convention violates the U. S. Constitution. She contends that an order granting her husband relief under the Convention would infringe her Constitutionally-protected right to travel, and her privacy right in her family relationships. As the court has pointed out, however, the court will not order that Lesley herself return to Italy. Nor are Lesley's family relationships jeopardized by any order this court might enter. Should she wish to remain in Chicago with her father and the rest of her family, she is entitled to do so. Again, as noted earlier, this court has no jurisdiction over any custody decision. Should such a decision be made in Italy, Lesley has offered no basis for a conclusion that the courts of that nation will not be fair to her.

Nor has Lesley offered evidence that returning Arianna to her father would create any risk of harm at all, let alone a grave risk. The exception for "grave risk of harm" sets a high standard for a court's refusal to return children. As the Sixth Circuit has observed, such a risk can exist in only two circumstances: when return of the child would put the child in imminent danger prior to resolution of the custody dispute (as from war, famine, or disease), or when, in cases of serious abuse or neglect, the country of habitual residence may be incapable or unwilling to give the child adequate protection. *Friedrich II*, 78 F.3d at 1068, 1069, quoting U.S. Dept. of State, Public Notice 957, 51 FR 10494, 10510 (March 26, 1986)). *Friedrich II* cautioned that "[t]he exception for grave harm to the child is not license for a court in the abducted-to country to speculate on where the child would be happiest." *Id.* at 1068.

The Second Circuit, similarly, recognizes two ends of a spectrum:

> At one end are those situations where repatriation might cause inconvenience or hardship, eliminate certain educational or economic opportunities, or not comport with the child's preferences; at the other end of the spectrum are those situations in which the child faces a real risk of being hurt, physically or psychologically, as a result of repatriation. The former do not constitute a grave risk of harm under Article 13(b); the latter do.

*Blondin v. Dubois*, 238 F.3d 153, 162 (2nd Cir. 2001). The *Blondin* court affirmed, after remand, the district court's finding of such a risk in what that court called "the particular and unusual circumstances" presented there: The only evidence on this issue was the unrebutted testimony of respondent's expert witness that the children would suffer a recurrence of acute, severe traumatic stress disorder if they were repatriated to France. *Id.* at 167.

No such evidence was offered in this case. Here, in fact, any suggestion that returning Arianna to Italy would place her at risk would be inconsistent with the evidence offered by Lesley Pritikin-Fabri's own witnesses that Massimo Fabri is an attentive, loving father. Lesley intimates that Massimo's relationship with another woman somehow jeopardizes Arianna's safety, but the court is unmoved. First, Massimo himself denied that he is living in the family home with another woman. (T. 382.) Further, as Massimo points out, Lesley testified that she had to urge Massimo to have Arianna overnight in his home. Massimo testified that Arianna stayed there regularly; but if Lesley's version is closer to the truth, it suggests Massimo's liaisons create no danger for Arianna.

The only concern that this record generates concerning Arianna's well-being in Italy relates to the family apartment. The Fabri family no longer owns that apartment, and there is apparently no written lease on it, although Massimo testified that he has paid monthly rent to the owner. The court expects that Massimo will provide Lesley and the court with written assurance that there is a home in Italy where Arianna and her mother, should she choose to accompany Arianna, may live indefinitely.

## CONCLUSION

For the foregoing reasons, Petitioner Massimo Fabri's motion for a warrant in lieu of a writ of *habeas corpus* (Doc. 2-1), and his motion for return of child under the Hague Convention (Doc. 31-1) are granted. Respondent's motion to strike certification (Doc. 11-1), motion to dismiss (Doc. 12-1), motion for a directed verdict (Doc. 27-1), motion to declare the Hague Convention unconstitutional (Doc. 30-1) and motion to strike (Doc. 36-1) are denied. The court hereby orders that Arianna Michelle Fabri be returned to Italy on or before July 31, 2001, with Respondent Lesley Pritikin-Fabri, should she wish to accompany Arianna. Should Respondent prove unwilling to accompany her daughter to Italy, Arianna shall be returned there with Petitioner.

ENTER:

Dated:     July 13, 2001

REBECCA R. PALLMEYER
United States District Judge